**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| GREGORY A. JONES, | : | |
| | : | Civil Action No. 20-10760 (KM) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**KEVIN MCNULTY, U.S.D.J.**

Petitioner Gregory A. Jones, a federal prisoner at FCI Allenwood in White Deer, Pennsylvania, moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. DE 4. Jones challenges his 2018 conviction for two separate bank robberies and a related weapons charge, for which I sentenced him to an aggregate term of 240 months' imprisonment. *See United States v. Jones*, Crim. No. 16-516, DE 85 (judgment). Also before me is Jones's request for appointment of counsel. DE 12. For the reasons below, the § 2255 petition is denied, Jones's request for an evidentiary hearing is denied, a certificate of appealability will not issue, and Jones's request for the appointment of counsel is denied.

## I.    BACKGROUND

### A.    Facts

The facts underlying Jones's conviction are set forth below.

#### 1.    The May 2014 Robbery

On May 6, 2014, Conny Jeanty was the branch manager of a Capital One Bank branch on Springfield Avenue in Newark, New Jersey, and Dora Fore was working as a security guard. DE 9-1 at 53–54, 96–97. Shortly after the bank opened, Jeanty and teller Marlee Ojeda were behind

the glass separating customers from the tellers (*id.* at 54), when a man whom Jeanty described as "[e]lderly, tall, skinny, emaciated," and who was wearing a scarf over his head and face, passed a note to Ojeda (*id.* at 54–55). The note said: "This is a robbery. They ain't no reason for no one to get hurt. I have a gun and will shot [sic] if I have to." DE 9-1 at 99–100, 120. The robber also stated that he had a bomb and would set it off. *Id.* at 54–55, 58, 97. Jeanty felt she would be able to recognize the robber's voice again because "i[t] was distinct. It was different from any customer that's ever gone in there, the anger that was behind it." *Id.* at 58.

Ojeda gave the robber marked bills and a dye-pack (a device concealed inside a stack of paper currency that, when activated, would cause red dye to explode). *Id.* at 56. Fore overheard the robber's threats and left the bank to call the police. *Id.* at 97. With Jeanty's assistance, Ojeda handed $4,000 in cash to the robber and gave him back his note, and he left the bank. *Id.* at 56. Fore, leaving the vicinity of a pay phone, started following him as he headed toward 18th Avenue. *Id.* at 97–98, 101–102. Fore saw the dye pack explode and watched as the robber "started removing the garments he had on." *Id.* at 98. When Fore got to 18th Avenue, she saw items scattered on the ground, including dye-stained money, a dye-stained note, a scarf, and sunglasses. *Id.* at 98–99.

Newark Police Officer Gary Robinson took pictures of the discarded items and placed them into evidence bags. DE 9-1 at 107–120. He later realized that a kufi hat had been wrapped inside the scarf and therefore had not been separately identified and photographed at the crime scene. *Id.* at 115, 116–17. Robinson swabbed the sunglasses for DNA and sent the swab, the sunglasses, the scarf, and the kufi to the New Jersey State Police DNA laboratory for testing. *Id.* at 111, 113–14, 116, 129–30. In June 2014, a serologist from the DNA laboratory swabbed the

kufi and scarf and sent those two swabs, as well as the sunglasses swab, for DNA analysis. *Id.* at 140–43.

A forensic scientist testified as an expert witness and opined that the sunglasses and kufi had DNA from a single source, but the scarf had DNA from two sources. *Id.* at 153–154. The scientist, who eventually obtained a buccal swab from Jones, concluded that Jones was the source of the DNA found on the sunglasses and kufi, and was one of the sources of DNA found on the scarf. DE 9-1 at 155, 158–60.

### 2.    The September 2014 Robbery

Four months later, on September 19, 2014, Jeanty was working at the same Capital One branch. DE 9-1 at 59. She was at her desk looking out the window when she noticed someone outside "placing gloves on, prearranging his hat, or something that was on his head, putting on a [sweatshirt]." *Id.* at 59–60. She realized another robbery was imminent. *Id.*

The robber went to teller Catricia Occidor's station and said, "Lady, this is a robbery. . . . I have a gun and I'm not afraid to use it." *Id.* at 60, 86–87, 90. He then stuck a handgun through the tray at the bottom of the window and said, "Give me all the money." *Id.* at 87–88. Jeanty, who was standing next to Occidor, observed a man who was "elderly, skinny, same emaciated face," and had "salt and pepper [facial] hair." *Id.* at 66, 92. Jeanty thought his voice "sounded just like the same person from before, and this time it's escalated." *Id.* at 60, 65. Occidor described the individual as slightly taller than 5'6", medium build, with a salt-and-pepper goatee. *Id.* at 88. The robber became agitated, ordered everyone to get down, and fired a gunshot into the ceiling. *Id.* at 61, 88. He fled from the bank with more than $2,000 in cash. *Id.* at 61, 63.

For clarity, it is helpful to note that the first, May 2014 robbery was investigated by the local police, and the second, September 2014 robbery was investigated by the FBI.

### 3. The April 2015 Victim-Witness Letter

In mid-April 2015, the Essex County Prosecutor's Office ("ECPO") sent a victim-witness letter to Ojeda informing her that "Gregory A. Jones" had been arrested in connection with the May 2014 robbery. DE 9-1 at 83–84, 95. Occidor (who identified Jones in court as the perpetrator of the other, September 2014 robbery) testified that Ojeda showed the ECPO letter to Jeanty and Occidor. DE 9-1 at 89, 95. Occidor then performed a Google search for "Gregory A. Jones" and saw a picture of him on a website that contained mugshots. *Id.* at 95–96.

FBI Special Agent Douglas Mann testified that he went to the bank on April 30, 2015, to further investigate the second, September 2014 robbery. DE 9-1 at 176. Jeanty, according to Mann, disclosed at that time that "she or other tellers" had seen a "mugshots" website and saw a picture of Jones, and she (Jeanty) identified him as the perpetrator of the September 2014 robbery. *Id.* at 176–77. At trial in 2017, however, Jeanty could not identify Jones, and denied seeing the victim-witness letter or conducting internet research. *Id.* at 62, 84–86.

### B. The Indictment, Trial, Sentencing, and Direct Appeal

In November 2016, a federal grand jury returned an indictment charging Jones with (1) the May 2014 bank robbery, in violation of 18 U.S.C. § 2113(a), (2) the September 2014 armed bank robbery, also in violation of 18 U.S.C. § 2113(a), and (3) discharging a firearm during and relation to a crime of violence (the second robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Crim. No. 16-516, DE 14 (indictment).

On May 15, 2017, the jury convicted Jones on all counts. Crim. No. 16-516, DE 62. As a career offender, Jones faced a Sentencing Guidelines offense level of 34 and a criminal history category of VI, for a Guidelines range of 360 months to life imprisonment (*i.e.,* 120 months on each of Counts 1 and 2, plus a mandatory 120-month consecutive sentence on Count 3). DE 9-1

at 253. On February 15, 2018, I varied downward from the Guidelines range, and imposed an aggregate sentence of 240 months' imprisonment, consisting of concurrent terms of 120 months on the bank robbery counts, to be served consecutively to a 120-month term on the weapons count. Crim. No. 16-516, DE 85 (judgment).

Jones appealed, asserting an issue that arose from the unusual happenstance that he had robbed the same bank twice. The prosecutor's office, in accordance with state law, sent the bank a victim-witness letter in connection with the first, May 2014 robbery, which led one teller to Google-search Mr. Jones's name and see his mugshot. (*See* Section I.A.3, *supra*.) On appeal, Mr. Jones argued that this amounted to a state-arranged identification procedure that unfairly tainted a bank witness's identification of Jones in connection with the second, September 2014 robbery. *United States v. Jones*, 785 F. App'x 68, 69 (3d Cir. 2019). The Third Circuit rejected this argument and affirmed the conviction on August 20, 2019. *Id.* at 74.

### C.     The First Step Sentence Reduction Motion

On December 15, 2021, Mr. Jones filed a *pro se* motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), primarily based on his age, his health, and the risk of serious consequences from a COVID-19 infection while incarcerated. (DE 103) I appointed counsel, who filed a second, counseled version of the motion. (DE 106) In a written opinion (DE 115), I found that, while Mr. Jones was over 65 years old and suffered from certain medical conditions, these did not rise to the level of extraordinary and compelling circumstances requiring his immediate release. In addition, I found that application of the factors under 18 U.S.C. § 3553(a) weighed heavily against early release. I noted, *inter alia*, that he had some thirteen felony convictions and that the 240-month sentence, while lengthy, represented a substantial downward variance from the minimum 360-month sentence dictated by the

Sentencing Guidelines. *United States v. Jones*, No. CR 16-516 (KM), 2022 WL 341201 (D.N.J. Feb. 4, 2022).

Jones appealed from the denial of compassionate release. The U.S. Court of Appeals found it unnecessary to consider whether the circumstances were extraordinary and compelling, opting instead to affirm on the basis that release was not warranted upon review of the § 3553(a) factors. *United States v. Jones*, No. 22-1388, 2022 WL 2800833 (3d Cir. July 18, 2022) (unreported).

### D.    The Current § 2255 Petition

Jones filed this § 2255 petition and a motion to appoint counsel in August 2020. DE 1, 2. He filed an amended petition in October 2020 (DE 4), asserting (1) trial counsel was ineffective in various ways (DE 4 at 7–11, 18 (Grounds 1–6)), (2) the Court erred in denying Jones's motion to suppress identification testimony based on state-arranged evidence (*id.* at 18 (Grounds 7, 10)), (3) the evidence at trial was insufficient to support the conviction (DE 1-1 at 25 (Ground 8)), and (4) cumulative error entitles him to habeas relief (DE 1-1 at 26 (Ground 9)). In October 2020, I denied Jones's motion to appoint counsel and ordered the Government to respond. DE 5, 6. The Government answered (DE 9) in December 2020, and in January 2021, Jones again requested the appointment of counsel to assist him with preparing a reply (DE 10). In December 2022, I denied that request and extended his time to reply to February 3, 2023 (DE 11). Jones did not file a reply. On February 7, 2023, however, he filed another request for the appointment of counsel. DE 12. Given that Jones has failed to submit a reply despite having more than two years in which to do so, I will consider the petition fully submitted and ready for decision. For the reasons below, the petition is denied, a certificate of appealability shall not issue, and the motion to appoint counsel is denied in light of the petition's lack of merit.

## II.     DISCUSSION

### A.  Legal Standards Applicable to § 2255 Motions

A prisoner in federal custody under sentence of a federal court "may move the court which imposed the sentence to vacate, set aside or correct the sentence" upon three grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; or (3) "that the sentence was in excess of the maximum authorized by law." 28 U.S.C. § 2255(a).

A criminal defendant bears the burden of establishing entitlement to § 2255 relief, *see United States v. Davies*, 394 F.3d 182, 189 (3d Cir. 2005), and "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014) ("a motion pursuant to 28 U.S.C. § 2255 is reviewed much less favorably than a direct appeal[.]"). In considering a § 2255 motion, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) (internal quotation marks and citation omitted). Pro se habeas petitions are liberally construed. *Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010) (citation omitted). The Court may deny the motion without holding an evidentiary hearing if the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief. *See* 28 U.S.C. § 2255(b); *Liu v. United States*, No. 11-4646, 2013 WL 4538293, at *9 (D.N.J. Aug. 26, 2013) (citing *Booth*, 432 F.3d at 545–46).

### B.  Ineffective Assistance of Counsel

Jones argues that trial counsel was ineffective for (a) failing to object to Jones being viewed in shackles by members of the jury pool (DE 4 at 7 (Ground 1)), (b) failing to secure

Jones's presence at his preliminary hearing (*id.* at 8 (Ground 2)), (c) failing to "object against/argue factual basis of evidence" (*id.* at 10 (Ground 3)), (d) failing to object to the Government's failure to provide Jencks material (*id.* at 11 (Ground 4)), (e) failure to "suppress photo-copied sketch and evidence/testimony of kufi" (*id.* at 18 (Ground 5)), and (f) failure to object to career offender status at sentencing (*id.* (Ground 6)).

To prevail on a claim of ineffective assistance of counsel, Jones must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that his counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. A court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"; thus, the court's scrutiny of counsel's performance "must be highly deferential." *Id.* at 689.

Second, Jones "must show that the deficient performance prejudiced the defense," (*id.* at 687), by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Id.* at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. "In the context of sentencing, prejudice requires a reasonable probability that, but for counsel's error, the result of the sentencing proceeding would have been different." *Grippo v. United States*, No. 14-4577, 2016 WL 7223316, at *5 (D.N.J. Dec. 12, 2016) (quoting *United States v. Polk*, 577 F.3d 515, 520 (3d Cir. 2009)).

Both prongs are required to establish a valid claim, but may be considered in either order. "A court need not first determine whether counsel's performance was deficient before examining

the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Strickland*, 466 U.S. at 668.

### 1.    Failure to Object to Jones being Viewed in Shackles

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). Jones asserts that counsel was deficient for failing "to object to petitioner being viewed in shackles by members of the jury at preliminary jury selection." DE 1-1 at 7 (Ground 1). Jones argues that "the mere fact that the effect of the jury's first impression of [him] in shackle[s] and the taint of this impression on the evidence presented to the jury infected the entire proceeding which followed." *Id.* at 9. He contends that "had it not been for counsel['s] failure to object[,] there is a reasonable probability that petitioner would have been acquitted but for petitioner['s] appearance before the jury pool in shackles, where the jury was allowed to sit directly behind [him]." *Id.* at 7. The focus of this claim appears to be a brief period, preceding jury selection, when the venire was seated in the spectator section of the courtroom before retiring to the assembly room.

I deny this claim for two reasons. First, it is very unlikely that any member of the venire could have seen the shackles, and speculative that any such person was seated as a juror. Second, there can be no showing of prejudice, given the strength of the evidence.

Mr. Jones was in the U.S. Marshals' custody, as he had been detained pending trial. (16cr516 DE 6) As the Government points out, Mr. Jones's hands, which of course the jury could see, were not restrained (DE 9-2 at 3 ("The Court: Now, you can hear, Mr. Jones. Raise

your hand if you can hear. [Jones]: Okay.")]. His legs, however, were shackled beneath the table. Jones has not established any likelihood that these shackles were visible to the jurors or potential jurors.

I take judicial notice of the layout of my courtroom during trial. At the beginning of the jury selection process, the entire venire sat in the spectator section of the courtroom while the court delivered some brief preliminary instructions to the group, which was then dismissed and sent to an assembly room. Thereafter, the potential jurors sat only in small groups, far from the defense table, before being summoned to the jury box for voir dire questioning.[1] At all relevant times, Defendant sat with his legs and feet under a large table, on the opposite side of the courtroom from the jury box. (He always entered and exited from the courtroom when the jury was not present.) Any view of his legs from the front or the side (including, of course, the jury box) was completely hidden by a table skirt. From the spectator section of the courtroom, the defendant's legs would be visible only from a limited angle or location. No such vantage point was occupied by the members of the venire during the brief initial instructions. Even the few potential jurors seated directly behind the defense table could see nothing of consequence. Behind the defense table is a row of high-backed, opaque chairs; behind that is a rail separating the well from the spectator section; and behind that are pews, the first of which is kept empty during criminal trials. Thus, even the seats with the most likely potential for a view are blocked off or obstructed. In addition, the connecting chain portion of the leg shackles is wrapped, generally in black duct tape, so as to make the chain less visible and muffle any potential noise. In short, the persons seated in the jury box could not possibly have observed the leg shackles,

---

[1]    This trial preceded the COVID-19 pandemic. Thereafter, the Court switched to a "struck jury" system, which is more conducive to social distancing measures.

and it is also highly unlikely that the members of the jury venire, which sat briefly in the spectator section, could have observed the leg shackles. No participant in the trial, including counsel, myself, or court personnel, noted at the time that the shackles could be observed by the potential jurors.

There is no indication in the record that the jury was aware that Jones was shackled, and unsupported speculations to the contrary are not a basis for habeas relief. *See, e.g.*, *Elkins v. United States*, No. 16-645, 2018 WL 1709093, at *2 (E.D. Mo. Apr. 9, 2018) (no habeas relief where "[t]he tables in the courtroom were fitted with skirts concealing any view of Elkins' legs from the jury, and the shackles were modified to eliminate any noise . . . and Elkins offers nothing but his self-serving, unsupported speculation that any member of the jury was ever aware that he was shackled during the trial"); *United States v. Monell*, No. 13-163, 2017 WL 5564572, at *9 (D.R.I. Nov. 17, 2017) (no ineffective assistance of counsel where: "The Court has reviewed the trial transcript, and . . . there is no indication whatsoever that the jury was aware that Monell was restrained. He was present in the courtroom when the jury was brought in. He remained in the courtroom when the jury was taken out. Monell did not testify; therefore, he had no occasion to move to the witness stand. The Court did everything it could to prevent the jury from discovering that Monell's ankles were shackled, and its efforts were successful."); *Jones v. United States*, No. 03-47, 2008 WL 4643909, at *5–6 (N.D.W. Va. Oct. 20, 2008) ("petitioner's counsel was not ineffective for failing to pursue a claim for mistrial arising out of a juror allegedly seeing the petitioner in shackles" where "petitioner's argument concerning this point of error is based in large part on speculation"); *Mancillas v. United States*, No. 21-119, 2022 WL 1003653, at *5 (S.D. Ind. Apr. 1, 2022) (no ineffective assistance of counsel where petitioner pointed to no facts establishing that "the jury saw him in shackles and handcuffed,"

and "the transcript reflects that he held up his arms during his outbursts"). In short, the contention that any member of the jury pool viewed the shackles, and that any such member ultimately sat on the jury, is speculative at best.

Moreover, even if Jones had established that his shackles were visible to any potential juror and that counsel was deficient for failing to object, he is not entitled to habeas relief because he cannot demonstrate prejudice. *See Strickland*, 466 U.S. at 694. There is no reason to think that a chance observation of leg shackles, even assuming it occurred and that the person was seated as a juror, would have affected deliberations. In light of the strong evidence of Jones's guilt—including the DNA evidence, eyewitness testimony, and in-court identification—I cannot conclude that there is a reasonable probability that the outcome of the trial would have been different. *See United States v. Calhoun*, 600 F. App'x 842, 847 (3d Cir. 2015) ("Given the magnitude of the evidence presented at trial, there is no reasonable probability that Calhoun would have been acquitted but for his shackling in front of the jury pool."); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1320 (11th Cir. 2016) (affirming trial court's denial of evidentiary hearing where "the only evidence that [petitioner] proffered in federal court is his brief statement in his . . . motion that he was shackled in some unspecified manner, for some indeterminate time, in view of some members of the venire panel during the jury selection process."). Accordingly, relief on this ground is denied.

### 2.      Failure to Secure Jones's Presence at Preliminary Hearing

Jones argues that counsel was ineffective for failing to secure his presence for a preliminary hearing (DE 1-1 at 8 (Ground 2)). He contends that counsel "improperly exclude[ed] him from his preliminary hearing, when the transcripts and record clearly support the fact that petitioner Jones stated on the record that he did not wish to waive his presen[ce] at his

preliminary hearing, yet 3 days after this notice[,] counsel arraigned a preliminary hearing without his presen[ce]." DE 1-1 at 11. Jones acknowledges that "defense counsel can waive his client's presence" at a preliminary hearing; he alleges, however, that his counsel "intentionally ignored [his] verbal request to be present at his preliminary hearing." *Id.* at 11–12. Jones asserts he was prejudiced because he was deprived "of the right to confront adverse witness [sic] and to advise counsel of any inconsistencies, errors or falsehood in the witness testimony." *Id.* at 12.

This argument is without merit. To begin with, there was no preliminary hearing, whether in or out of Jones's presence, so he missed no opportunity to be present or to challenge testimony. As I have previously determined, Jones waived a preliminary hearing. Crim. No. 16-516, DE 29 at 2-3 (order on omnibus pretrial motions: "Defendant's oral motion to the effect that he never consented to waive preliminary hearing is DENIED as contrary to the record.") (citing Crim. No. 16-516, DE 9 (Jan. 25, 2016 letter from counsel to Magistrate Falk: "I met with Mr. Jones at the Essex County Jail on Friday, January 22, 2016. At that time, he advised me that he is waiving his right to a preliminary hearing . . . .")).

Moreover, even if Jones did not consent to waive a preliminary hearing, he has not established prejudice. As another Court in this district explained:

> At a preliminary hearing, a magistrate judge determines whether there is probable cause to believe that a defendant committed the offense at issue. *See* Fed. R. Crim. P. 5.1. Thus, Petitioner must establish that if there was a preliminary hearing, [the magistrate judge] would have concluded that there was not probable cause to believe that Petitioner committed the offenses at issue. . . . At the preliminary hearing stage, the Government need only establish probable cause to sustain the charges.
>
> The Government contends that if Petitioner had requested a preliminary hearing, the Government would have obtained an indictment before the hearing. The Government may be correct, but the Court finds that the Government would have easily established probable cause at a preliminary hearing. . . . Consequently, there is no indication that a preliminary hearing would have ultimately changed the outcome here. Petitioner has not established prejudice. As a result, Petitioner fails to establish that . . . counsel was ineffective.

13

*Alvarez v. United States*, No. 16-4548, 2017 WL 3288605, at *7 (D.N.J. Aug. 2, 2017) (footnotes omitted).

The same two rationales hold true here. First, in this district the almost invariable practice in felony cases is that, where a preliminary hearing has been scheduled, the U.S. Attorney will obtain an indictment in advance of that date, establishing probable cause and thereby mooting the hearing.[2] Second, even setting that practical reality aside, there is no showing of prejudice. Assuming *arguendo* that counsel rendered deficient performance in waiving the preliminary hearing, the strong evidence that Jones committed the charged offenses necessitates a conclusion that, if a preliminary hearing had been held, the Government would have easily established probable cause. After all, the government did establish probable cause before the grand jury, and at trial, with the opportunity for full cross-examination, it obtained a jury verdict of guilt beyond a reasonable doubt. Accordingly, relief is denied on this claim.

### 3.    Failing to Challenge "Factual Basis of Evidence" and Suppress Composite Sketch and Kufi Evidence

Jones asserts that counsel was ineffective for failing to "object against/argue factual basis of evidence" (DE 4 at 10 (Ground 3)) and failing to "suppress photo-copied sketch and evidence/testimony of kufi" (*id.* at 18 (Ground 5)). As to the sketch, Jones argues that (1) "the Government was allowed presentation of false information regarding the origins of the [photo-copied] composite-sketch alleged to have depicted the petitioner" (DE 1-1 at 13); (2) "counsel was aware that this evidence was not properly admitted" (*id.*) and knew "that the original drawn

---

[2]    It is for this reason that defense counsel in felony cases often waive a hearing, since insistence on it would be fruitless. Under the Federal Rules, a preliminary hearing must be held within 14 or 21 days (depending on whether the defendant is in custody), unless an indictment intervenes. *See* Fed. R. Crim. P. 5.1. Under the Speedy Trial Act an indictment must be procured within 30 days. 18 U.S.C. § 3161(b). The practical result is that, for the prosecution, nothing is to be gained from holding a preliminary hearing except a brief respite before an indictment must be obtained anyway.

sketch was available for presentation with accurate date and time to verify its authenticity" (*id.* at 14), but failed to object; and (3) this failure led "the jury to believe without a doubt that the copy sketch was an exact resemblance of the perpetrator" (*id.*). Jones contends that counsel should have moved to suppress the sketch because (a) "the original was available" (*id.* at 21) and (b) "the sketch was not identical to petitioner" (*id.* at 19).

As to the kufi, Jones argues that testimony that "the alleged perpetrator was carrying a kufi as part of the evidence recovered at the crime scene [led] the jury to believe that this evidence was part of the evidence the perpetrator was wearing during the robbery, and that petitioner had wrapped the kufi inside the scarf to conceal it." *Id.* at 18. Jones also argues that the jury was informed during the Government's opening statement about a phone call Jones made from jail "requesting his family to bring him a kufi . . . suggesting to the jury that the kufi found on the scene more than likely belongs to petitioner Jones." *Id.* at 19. Jones contends that counsel should have moved to suppress evidence of the kufi because the kufi "was not document[ed] or noted by investigator as part of the evidence that would be utilized against defendant" (*id.* at 18) and it "was extremely prejudicial" (*id.* at 21).

These claims are contrary to the record and otherwise meritless. First, as to the composite sketch, it was Jones's counsel, not the Government, who presented the evidence of the sketch, as part of a reasonable defense strategy. DE 9-1 at 172–75. It was also defense counsel who elicited testimony about the missing last two numbers of the year on the photocopy of the sketch. *Id.* at 173–74. Counsel then used this evidence during his closing argument in an attempt to discredit Occidor's in-court identification by arguing that—as allegedly evidenced by the inaccurate rendering—she was not focused on Jones's face during the robbery:

> I submit to you she was not focused [at] all on the bank robber's face. And I
> submit to you that what she did see were like large, with a general characteristics

of the bank robber, and that's what she told to the sketch artist when she went and had the sketch made just three weeks later. . . .

But what we do know about the -- what happened with the sketch is, she met with Detective Sergeant Theckston from the New Jersey State Police three weeks after the incident. And he made -- gave his best effort to recreate a sketch of what she believed she saw. She sat with him from one to two hours. He told you he's done hundreds of these sketches. It's not a five-minute process where you come in and he blows out a sketch and you're gone. He does it with the person. He tries to incorporate what they tell him.

And I'm sure the Government is going to say a sketch process isn't a perfect process, but there's certain things that you would think a person would be able to remember. And when you look at the sketch in this case, when you look at the sketch that was created in this case, I get it. It's a sketch. No one is perfect. But if Miss Occidor is saying that Gregory Jones is the man that was in the bank on September 19th, you saw the Government's photo they put up during their summation. If she's saying that Gregory Jones is the man that robbed the bank on September 19th, I don't think there's anyway that that sketch, the man in that sketch, has facial hair like that. The Government is going say that she got it wrong. But the thing that you wouldn't get wrong is the color of the hair.

You see Gregory Jones today, he has essentially a very gray and white beard. And on December 4th of 2014, the goatee that he had was white then -- at that time was white. And it's very hard to tell from the video what color the man's beard is in the bank robbery video. But she's telling you through this photo what color the man's facial hair was, and that is not a gray beard. That is not a white beard. That is not Gregory Jones.

Crim. No. 16-516, DE 68 at 73.

In short, counsel used the discrepancies between the sketch and the in-court appearance of Jones to his client's advantage. While Jones may now, in hindsight, disagree with counsel's decision to introduce the composite sketch, this is not a basis for habeas relief. Counsel's strategic decision to introduce this allegedly inaccurate depiction of Jones—allegedly based on the account of an eyewitness who made a positive in-court identification—falls within the purview of professional judgment that is entitled to a presumption of reasonableness under *Strickland*. 466 U.S. at 689 (there is a strong presumption that counsel is effective and the courts must be "highly deferential" to counsel's reasonable strategic decisions); *Marshall v. Hendricks*,

307 F.3d 36, 85 (3d Cir. 2002) (the mere existence of alternative, even more preferable or more effective, strategies does not satisfy the first element of the *Strickland* test); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("the range of reasonable professional judgments is wide and courts must take care to avoid illegitimate second-guessing of counsel's strategic decisions from the superior vantage point of hindsight"). Counsel's performance does not become deficient simply because the strategy employed was unsuccessful or insufficient to overcome the strong evidence of Jones's guilt. *See Lewis v. Mazurkiewicz*, 915 F.2d 106, 115 (3d Cir. 1990) ("[W]hether or not some other strategy would have ultimately proved more successful, counsel's advice was reasonable and must therefore be sustained."); *United States v. Jackson*, No. 10-199, 2019 WL 1571671, at *4 (W.D. Pa. Apr. 11, 2019) ("Importantly, reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful.") (cleaned up).

The record also contradicts Jones's ineffective-assistance claims regarding the kufi, because counsel did in fact object to the admission of the kufi. I overruled the objection:

(The following takes place at sidebar)

. . .

MR. HOLMAN: There is no photograph with respect to the collection of the hat at the scene and so we're objecting on that basis. We understand that he's testifying that he collected it at the scene, and our objection is based on that.

THE COURT: Just confirm that there's no photograph.

MR. SHAPIRO: There's no photograph of the hat, but I can proffer that the witness will testify that it was inside of the scarf.

THE COURT: Testimony is sufficient foundation for chain of custody. I get it that you're saying it's weaker than the other ones, and you could certainly examine on that basis, if you chose. As an objection for admission, I will admit that.

DE 9-1 at 115–116. Counsel then exploited the lack of any photographic evidence of the collection of the kufi. He cross-examined the witness about the lack of photographs showing the placement of the kufi (*id.* at 120–25), and referenced the issue again in his closing:

> And when [the crime scene officer] testified it was clear that he did not follow proper procedure with respect to that crime scene. He explained to you or he testified that the scarf contained the hat, and that he didn't realize it until he got back to the lab. But when he testified, if you paid attention to what he was saying, a great deal of what he -- a great deal of his inconsistencies didn't come out until I started asking him questions. If I was asleep at the wheel, or if we were asleep at the wheel when we were cross examining him, you would have believed that the Kufi was placed into an individual manila envelope and taken to the lab in an individual manila envelope. That did not come out until cross examination. And that's, I don't know, I think that's a problem. That's not something that you don't bring out if the defense can't point it out on cross examination. And we weren't asleep at the wheel, so we did point that out and say that we brought out the fact that the Kufi was not there on the street. The Kufi was not in any crime scene photos. What happened – where's the Kufi? What's happening with it? And I submit that you can't believe anything about the Kufi and what occurred with respect to it. And it should bring into question everything about the items that were recovered.

DE 68 at 64–65. On this record, where Jones objected to the introduction of the kufi, conducted a vigorous cross-examination of the witnesses who handled the evidence, and argued during closing that the handling of that evidence was improper, Jones cannot establish deficient performance. And even if counsel's performance had been deficient, in light of the strong evidence of Jones's guilt, Jones has not established prejudice in that sense that but for the alleged deficient performance he would have been acquitted. Accordingly, relief on these claims is denied.

### 4.    Failing to Object to the Government's Failure to Provide Jencks Material

Jones argues that counsel was ineffective for failing to object to the Government's failure to "provide a 'Jenk [sic] List' within the prescribed time frame of seven day[s] before trial." DE

1-1 at 15–15; DE 4 at 11 (Ground 4)). Jones contends that he "did not receive a list of the witness[es] against him until the third day of trial." DE 1-1 16.

The Jencks Act directs that "in any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by the Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). "Although the Government does not have an obligation to disclose Jencks Act material before the conclusion of direct examination, courts may encourage early disclosure to obviate trial interruptions." *United States v. Tejada*, Crim. No. 12-312, 2013 WL 3786299, at *6 (D.N.J. July 17, 2013) (quotations and citations omitted).[3]

Here, with the government's consent, I ordered Jencks material to be disclosed 3 days before trial. *See* Crim. No. 16-516, DE 29 at 3 (order on omnibus pretrial motions: "Defendant's motion for production of *Giglio* and Jencks material is GRANTED on consent in that the government will produce such material at least three days before trial."). The first day of trial was May 9, 2017, and the Government produced Jencks material on May 3, 2017 (six days before trial). *See* DE 9-3 at 2 (May 3, 2017, email to defense counsel regarding Jencks production). Accordingly, as the record unambiguously contradicts Jones's claim that Jencks material was not timely disclosed, he is not entitled to relief on this claim.

---

[3]     Imprecise use of the term "Jencks material" tends to obscure the fact that the function of the Jencks Act, 18 U.S.C. § 3500, is to *bar* compelled disclosure of prior witness statements and reports until the witness has testified on direct examination. In this district, however, the government will often make early disclosure on a voluntary basis.

### 5.      Failure to Object to Career Offender Status at Sentencing

Jones argues that counsel was ineffective for failing to object to the inclusion of his prior convictions in the PSR because (1) the challenged sentence for the bank robberies and weapons offense was not imposed within 15 years of the commencement of his 1991 conviction and (2) another conviction in the PSR (which Jones does not specify) was not a crime of violence or serious drug offense supporting a career offender designation.[4] DE 4 (Ground 6); DE 1-1 at 22.

Jones's 1991 conviction was properly counted towards his criminal history. The conviction resulted in a sentence of 10 years' imprisonment and he was paroled on January 10, 2000. PSR ¶ 55. The bank robberies took place on May 6, 2014, and September 19, 2014. PSR ¶¶ 12-16. U.S.S.G § 4A1.2, provides:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period.

As Jones was incarcerated until January 10, 2000, which falls within the relevant 15-year "lookback" period, the 1991 conviction was properly counted.

By the "other conviction," Jones appears to mean the 2012 arrest leading to the 2013 conviction for "theft from the person."[5] That, however, was not one of the convictions used to

---

[4]      Pursuant to U.S.S.G. § 4B1.1, a defendant is a career offender if the following conditions are met:

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction;

(2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and

(3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

[5]      Jones argues that a 2012 conviction was improperly used to support a career offender designation because it was not a crime of violence or serious drug offense, but rather, a "misdemeanor conviction" resulting from Jones's guilty plea to an "amended charge." DE 1-1 at 23. This is an apparent reference to

establish that Jones was a career offender. *See* DE 9-1 at 252–53 (ruling that the Career Offense Guideline applies because "the current crime is one of violence, a 2113(a) bank robbery," and there are predicate felonies of prior controlled substance offenses and violent offenses based upon Jones's 2002 conviction for distributing cocaine and his 1992 convictions for first-degree robbery and second-degree aggravated assault); *id.* at 253 (subject to certain rulings, "I adopt the PSR as my findings of fact in this case"); PSR ¶¶ 43, 55, 56 (Jones's 1992 first-degree robbery and aggravated assault convictions constitute crimes of violence and Jones's 2002 convictions for possession with intent to distribute CDS constitute controlled substance offenses).

Contrary to Jones's assertion, the transcript establishes that defense counsel did object to the career offender designation in an effort to preserve Jones's arguments for appeal. The parties briefed the career offender issue and addressed it at sentencing. I ruled that under controlling precedent, the prior convictions were predicate drug or violent offenses, and the Career Offense Guideline applied:

> THE COURT: Okay. How about the priors?
>
> MS. GILLEN: Sure, your Honor. So Mr. Jones also has a prior first-degree robbery. In accordance with *United States v. Knight*[6] he preserves his objection that this is not a predicate felony for career offender purposes because it was wrongly decided; *Knight* was wrongly decided.
>
> THE COURT: Okay.

---

Jones's 2013 conviction for "theft from the person" (the arrest, not the conviction, was in 2012). PSR ¶ 59. Jones's guilty plea to an amended charge was accurately reflected in the PSR:

> Although the Judgment of Conviction filed in connection with this case reports the count of conviction as first-degree robbery, a review of the plea transcript dated October 28, 2013, received after disclosure of the final presentence report, confirms the defendant pled guilty to the amended charges outlined above [referencing Theft from the Person charge].

PSR ¶ 59. For the reasons stated in text above, the significance is limited.

6       In *United States v. Knight*, the Third Circuit held that the defendant's prior convictions for first-degree robbery under New Jersey law qualified as predicate crimes of violence under the career-offender provisions of the Sentencing Guidelines. 705 F. App'x 58, 61–62 (3d Cir. 2017).

MS. GILLEN: He submits, your Honor, and maintains that the statute can be satisfied by less than violent physical force, it doesn't qualify as a crime of violence. As to his prior aggravated assault conviction, he also submits that it does not qualify as a predicate crime of violence since this statute -- under the statute that offense may be committed recklessly and it is insufficient under established Third Circuit precedent.

THE COURT: Okay. Again, I wanted to have the record be clear for you because if you want to take this up on appeal, I just want it to be very clear that you placed your objection on the record. I do rule that the career guideline offense -- the Career Offense Guideline, I should say, applies; that the current crime is one of violence, a 2113(a) bank robbery. That the prior -- that there [are] priors -- actually both controlled substance offenses and violent offenses, correct, Mr. Shapiro? We have both of them here, don't we?

MR. SHAPIRO: Yes, your Honor.

THE COURT: Recognizing the objection that you would like to pursue in a higher court, Ms. Gillen, of course that's entirely appropriate, but for the meantime I've got to follow those precedents and -- including *Knight*, and find that the prior was a crime of violence. The aggravated assault kind of presents a potentially complex issue. I come down that it would be a crime of violence but, frankly, it's superfluous in that the other priors are enough to bring the career guideline into play so we don't even get to the aggravated assault. But should -- I will place on the record that I do regard it as a crime of violence so that if, for example, one of the other ones got knocked out and that did turn out to be significant, you would have your position on that, too.

MR. SHAPIRO: Your Honor, may I be heard?

THE COURT: Sure. Go ahead.

MR. SHAPIRO: Just so that the record is clear, in the Government's submission at pages 9 through 12, where we discuss the first-degree robbery conviction, we argue that the crime is divisible and that the face of the indictment makes clear that Mr. Jones was convicted of violating Subsection 2 of the robbery statute, and the fact that he threatened the immediate use of a gun is what rendered his offense a first-degree crime. And just so the record is clear, we would ask if that is your Honor's ruling on examining the –

THE COURT: Yes, I was perhaps a little too telegraphic. I accepted the Government's position that, yes, having inspected -- it being a divisible crime that can be committed more than one way, I inspected the court papers from the state court that were submitted by the Government and concluded that the particular manner in which the crime was committed that underlay the aggravated assault conviction was one that did require use of violence. That was my shorthand for that. But as I say, we don't even get to that unless one of the other ones gets knocked out.

(Sentencing Tr. 5–7 (16cr516 DE 88)).[7]

Jones did not challenge his career-offender status on direct appeal, and he does not now challenge my prior adjudication that his narcotics distribution and first-degree robbery convictions are qualifying predicate offenses sufficient to support his career offender designation. More to the point, there is no basis for finding *counsel* to have been ineffective with respect to this issue. Given that Jones fails to identify any error that occurred at sentencing and counsel did in fact object to his career designation status at sentencing, Jones cannot establish that counsel rendered deficient performance. Accordingly, relief on this claim is denied. *See*, *e.g.*, *United States v. Eddings*, No. 16-4-8, 2022 WL 900343, at *4 (W.D. Pa. Mar. 28, 2022) ("there was nothing illegal or improper about petitioner's guidelines calculations at the time petitioner was sentenced and therefore petitioner has failed to even identify an error that occurred at sentencing, let alone one that would qualify for review under the limited scope of relief available through § 2255").

## C.    Suppression Motion

Jones argues that the Court erred in (1) denying his motion to suppress "identification testimony based on state arranged evidence" (DE 4 at 18 (Ground 7)), and (2) finding that the "prosecutor letter naming Jones as the masked robber was not state action" (DE 4 at 18 (Ground 10)). This issue, decided against Jones on direct appeal, can furnish no basis for § 2255 relief.

In his motion to suppress the eyewitness identification, Jones argued that the identification was tainted by exposure to the online mugshot which, Jones argued, was the

---

[7]    As noted above, the Court varied downward from the otherwise-applicable Career Offender sentence of 360 months to life. Instead, I imposed concurrent sentences of 120 months on Counts 1 and 2, plus the mandatory consecutive 120-month sentence on Count 3, for a total sentence of 240 months.

equivalent of a government-arranged, suggestive identification procedure. *United States v. Jones*, No. 16-516, 2017 WL 752830, at *3 (D.N.J. Feb. 27, 2017). I denied the motion, finding that the letter did not constitute state action because not only was there a lack of intent to create a suggestive situation on the part of law enforcement officers, but also a lack of involvement on the part of law enforcement officers in the bank employee's decision to do a Google search for Jones. *Id.* at *7.

Jones appealed, and the Third Circuit affirmed, holding as follows:

Here, the State conveyed Jones' identity directly to someone connected to an ongoing investigation. But this identification was also attenuated: (1) the letter was sent to Ojeda, a witness in the first case only, not Occidor in the second case; (2) it only referenced the May robbery and did not suggest Jones was involved in the September robbery; and (3) the FBI, rather than the local police, investigated the second robbery. It is worth discussing each of these points in turn.

To start, the Prosecutor's Office provided a standard update to a May witness notifying her that Jones had been apprehended in that robbery; it made no mention or suggestion that he was a suspect in the September robbery. Ojeda then decided to pass the letter on to Occidor (and possibly other coworkers), who Googled Jones and identified him in the September robbery.

Second, the Prosecutor's Office did not give Jones' name to a witness to the September robbery. It sent the letter to Ojeda, who was not even present at the bank in September. Though it sent a letter to someone employed at the bank during both robberies, the Prosecutor's Office did not communicate any information about the suspect to a witness to the second robbery. We are skeptical that this factor alone would prevent a procedure from being state-arranged. However, viewed in context in this instance, that the letter was sent to a non-witness weighs against the contention that the Government arranged a suggestive identification procedure.

Finally, different authorities—state and federal—were responsible for the two investigations. The central policy goal articulated in [*Perry v. New Hampshire*, 565 U.S. 228 (2012)], deterring government officials from rigging identifications to secure convictions, may be less pressing where the state authority only prosecuted Jones for the May robbery. *Perry*, 565 U.S. at 232–33. Here, too, we are hesitant, as state and federal law enforcement entities have incentives to work together. But we note this feature as a further point of attenuation in this case.

Without drawing a firm line, we conclude that the letter from the Prosecutor's Office was not enough to constitute a state-arranged procedure. Our decision rests

24

on the totality of the circumstances here rather than any one particular feature of
this case.

*United States v. Jones*, 785 F. App'x 68, 73–74 (3d Cir. 2019).

Thus, Jones has already litigated the identification issue before this Court and before the
Third Circuit. *A fortiori,* there is no basis to find counsel ineffective; counsel pursued the issue at
both the trial and appellate levels, albeit unsuccessfully. The arguments in Jones's § 2255 motion
are the same arguments he raised in his suppression motion and on direct appeal, and would
require this Court to revisit an issue that has already been determined by a higher court. As
"cases have held that Section 2255 generally may not be employed to relitigate questions which
were raised and considered on direct appeal," Jones's identification claims are not cognizable.
*See United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993);  *Sonneberg v. United States*,
No. 01-2067, 2003 WL 1798982 (3d Cir. Apr. 4, 2003) ("It is well settled that a petitioner
generally may not relitigate issues that were decided adversely to him on direct appeal by means
of a Section 2255 petition."); *Jackson v. United States*, No. 11-3392, 2011 WL 4343690, at *3
(D.N.J. Sept. 14, 2011) ("A section 2255 motion is not a substitute for appeal, nor may it be used
to relitigate matters decided adversely on appeal."); *Amponsah v. United States*, No. 08-114,
2009 WL 900732, at *4 (D.N.J. Apr. 2, 2009) (refusing to consider alleged sentencing issue in
§ 2255 motion because Third Circuit had found on direct appeal that there was no sentencing
error). Accordingly, relief on these claims is denied.

### D.    Sufficiency of the Evidence and Cumulative Error

Jones argues that (1) "the evidence presented at trial was legally insufficient to support a
conviction . . . because it was inherently contradictory and unreliable" DE 1-1 at 25–26 (Ground
8), and (2) the cumulative effect of the grounds for relief asserted herein entitle him to habeas
relief, DE 4 at 19 (Ground 9).

Federal Rule of Criminal Procedure 29(a) provides as follows: "[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In denying Jones's Rule 29 motion at the close of the government's case in chief, I explained:

> I've got in mind that the standard is a very high one or very low one depending on which side you're on. What I mean by that is all that the Government needs to show to defeat a Rule 29 motion is that there's, sufficient evidence from which a reasonable jury could find guilt. And, I mean, applying reasonable doubt, and that means that we are very, very reluctant to take an issue away from the jury, except in an extreme case of failure of the proofs. Here, we do not have that. I'm not saying the jury has to believe the Government's evidence. Maybe they won't. But there is evidence, that is, there is DNA evidence that a jury could find links the defendant to the first bank robbery. There's an eye witness who made an in-court identification of the defendant as the second robber. And there was testimony about the discharge of the gun, which is the third charge in the indictment. That evidence, if believed, and again a big if, we're not at that stage, but there is evidence, if believed, that could support a guilty verdict. So I'm going to deny the Rule 29 motion.

DE 9-1 at 166–167.

I cannot accept Jones's claim that the evidence is "contradictory and unreliable" and thus "insufficient to support a conviction." (DE 1-1 at 25–26) To the extent Jones argues that I should have granted the Rule 29 motion, that claim is rejected for the reasons stated on the record (quoted above). To the extent Jones argues afresh that the evidence does not support his conviction, that claim is also rejected. The evidence at trial—including the DNA evidence from the discarded items after the May 2014 robbery and Occidor's in-court identification of Jones as the September 2014 robber—was more than sufficient to support the jury's decision to convict. Accordingly, relief on this claim is denied.

Finally, Jones's claim of cumulative error is also denied. "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such

that collectively they can no longer be determined to be harmless." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). I have considered the claims separately and in combination. The claims raised by Jones individually lack substantial merit, and in combination they do not add up to a showing of prejudice.

*    *    *

For the reasons stated above, Jones's § 2255 petition is denied. Further, because the files and records of the case conclusively show that Jones is not entitled to relief, Jones's request for an evidentiary hearing is denied. *See* 28 U.S.C. § 2255(b); *Liu*, 2013 WL 4538293, at *9 (D.N.J. Aug. 26, 2013). Finally, Jones's request for the appointment of counsel is denied as moot, in light of the claims' lack of substantial merit, based on the face of the record.

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's § 2255 ruling debatable. Accordingly, no certificate of appealability shall issue.

IV.     **CONCLUSION**

For the foregoing reasons, Jones's habeas petition is denied, his request for a hearing is denied, no certificate of appealability shall issue, and Jones's request for the appointment of counsel is denied as moot. An appropriate order follows.

DATED:  February 22, 2023

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge